TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-1259
     Facsimile: (213) 894-0141
     E-mail:    alexander.schwab@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-531-CAS-3 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT JOSEPH KIEFFER |
| v. | |
| JOSEPH KIEFFER, | Sentencing Date: July 12, 2021<br>Location: Courtroom of the Honorable Christina A. Snyder |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Alexander B. Schwab, hereby files its sentencing position regarding defendant Joseph Kieffer.

This sentencing position is based on the attached memorandum of points and authorities, the Presentence Investigation Report ("PSR"),

//

//

the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 28, 2021 Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


         /s/
ALEXANDER B. SCHWAB
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.     INTRODUCTION....................................................1

II.    STATEMENT OF FACTS..............................................2

III.   SENTENCING GUIDELINES...........................................5

IV.    ARGUMENT........................................................7

       A.    A Two-Year Sentence Is Sufficient, But Not Greater
             Than Necessary, to Accomplish the Goals of Sentencing.....7

       B.    Restitution and Forfeiture................................9

       C.    Probation's Recommended Fine and Conditions of
             Supervised Release Are Appropriate.......................10

V.     CONCLUSION.....................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                 PAGE

**Federal Cases**

United States v. Jackson,
    189 F.3d 820 (9th Cir. 1999) ................................... 11

**Federal Statutes**

18 U.S.C. § 3583 ........................................... 10

**United States Sentencing Guidelines**

USSG § 2B1.1 ............................................... 5
USSG § 2B4.1 ............................................... 5
USSG § 3B1.2 ............................................... 6
USSG § 5E1.2 .............................................. 10
USSG § 5K1.1 ........................................... 1, 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Joseph Kieffer pleaded guilty to conspiracy to violate the Anti-Kickback Statute for his involvement in directing millions of dollars to steer illegal prescription referrals for compounded medications to Fusion Rx, a pharmacy owned by his codefendant Navid Vahedi.  Because, ordinarily, compounded drugs are tailored to meet a patient's needs when the FDA-approved alternative is inadequate, they frequently are reimbursed by health providers at far higher rates than ordinary drugs.  With defendant's knowledge, Vahedi also began paying copayments on behalf of patients to ensure they continued to seek to fulfill their prescriptions regardless of medical need, and Vahedi enlisted Kieffer to maintain the illusion that patients were paying their copayments.

Defendant's scheme was lucrative, intricate, and long-lasting. Eventually, however, defendant entered a plea agreement in which he accepted responsibility and agreed to cooperate by testifying truthfully against any codefendants, which the government assumes played some role in the decision of his remaining codefendants to enter their own guilty pleas.  The government therefore moves for a two-level downward departure pursuant to USSG § 5K1.1 and recommends a sentence at the low end of the resulting guideline range: 24 months' imprisonment to be followed by a three-year period of supervised release, a fine of $10,000, a $100 special assessment, and restitution as set forth below.[1]

---

[1] A money judgment of forfeiture was already ordered by the Court, and defendant has already satisfied that obligation in advance of sentencing.

**II.   STATEMENT OF FACTS**

As part of his change of plea, defendant agreed to the following facts:

<u>Relevant Entities and Individuals</u>

Between no later than June 2014 and at least February 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant entered an agreement with Dr. N. Vahedi Pharmacy, Inc., doing business as Fusion Rx Compounding Pharmacy ("Fusion Rx"); Navid Vahedi; and Joshua Pearson, to knowingly and willfully offer to pay and to pay remuneration in the form of illegal kickbacks to generate and steer compounded drug prescriptions to Fusion Rx for dispensing, where the dispensing of drugs pursuant to many of those prescriptions was reimbursable in whole or in part under Federal health care programs, including TRICARE.

Fusion Rx, a pharmacy administered by Vahedi, was a provider of compounded drugs, that is, drugs that are manufactured to meet the needs of a specific patient because an FDA-approved alternative fails to meet those needs.  The provision of compounded drugs is often reimbursed by insurance providers and federal health care benefit programs at a higher rate than FDA-approved drugs due to the individual tailoring necessary in their preparation.  Defendant partnered with Vahedi, through a business entity defendant controlled, Sheridan Medical, to generate prescriptions, steer referrals, and dispense compounded drugs through Fusion Rx by acting as an intermediary between Fusion Rx and individuals known as "marketers" who would steer referrals for compounded drugs to Fusion Rx in return for kickbacks.

Co-conspirator Pearson -- operating through his business entity, PHIRX LLC ("PHIRX") -- was one of the primary marketers who generated prescription referrals for compounded drugs to be dispensed at Fusion Rx.

<u>Kickbacks Paid for Prescription Referrals</u>

Defendant, Vahedi, and Fusion Rx sought to have prescriptions for compounded drugs submitted to Fusion Rx so that Fusion Rx could then bill various insurance providers, including Federal health care programs such as TRICARE, for the provision of those compounded drugs. After learning of Fusion Rx, co-conspirator Pearson contacted Vahedi so that Pearson could work for Fusion Rx and generate compounded drug prescription referrals for the pharmacy.  In response, Vahedi directed Pearson to defendant, so that defendant and Pearson could work together to steer prescription referrals to Fusion Rx.

2

Specifically, in exchange for the generation and routing of compounded drug prescriptions by marketers like defendant, Vahedi, through Fusion Rx, paid commissions to defendant and other marketers, through Sheridan Medical. Because Vahedi and defendant had a preexisting business relationship, the routing of payments to Pearson through defendant and Sheridan Medical avoided the appearance that the pharmacy was paying for compounded drug prescription referrals from Pearson. The commissions represented a varying percentage of the amount insurance plans reimbursed for the prescription referrals. Defendant would, in some instances, take a portion of this commission for himself and use the remainder to pay kickbacks to Pearson for his referrals to Fusion Rx. For example, on March 10, 2015, defendant paid a $470,937.25 commission to Pearson, via PHIRX, through a check drawn on his account with First Bank and bearing the memo "Jan Commissions."

In order to facilitate the prescription referrals, defendant, Vahedi, and Pearson, agreed to the use of preprinted prescription script pads, which were disseminated to physicians, including physicians who were not otherwise treating a particular patient. Defendant, Vahedi, and Pearson relied on these preprinted prescription forms to generate compounded drug prescriptions referrals through offering various "check-the-box" options on the form to maximize the amount of insurance reimbursement for the compounded drugs. Using the preprinted script pad forms, physicians would select a compounded drug formulation from the form's options and the marketers or respective physicians would send the prescriptions to Fusion Rx for dispensing.

Knowledge/Willfulness

During his participation in the conspiracy, defendant knew it was illegal to pay remuneration to induce the referral, order, or purchase of any item or service reimbursed under a Federal health care program. In June 2014, for example, Pearson sent defendant an email explaining that Pearson was looking into ways to convert the commission-based arrangement to a lawful arrangement under the statutory "safe harbors." Despite this, defendant chose not to alter the arrangement he had with Pearson, and continued to pay Pearson straight commission-based amounts in exchange for prescription referrals. Based on his participation in the scheme, defendant believes Vahedi also knew that the commission-based arrangement was unlawful.

Accounting

From no later than June 2014 to at least February 2016, Fusion Rx received approximately $14 million in reimbursement from health care benefit programs, including over approximately $5 million from federally-funded health

3

care programs. As a result of facilitating the authorization and steering of compounded drug prescriptions, Vahedi paid defendant, through Sheridan Medical, approximately $7,980,201 in commissions. Of this amount, Vahedi and defendant caused the payment of approximately $5,419,759 in further commission-based kickbacks to Pearson, through PHIRX, that resulted in the defendant receiving approximately $2,560,442, some of which he used to pay other marketers. Approximately $1,250,000 of the kickback amount paid to Pearson was for prescriptions for the dispensing of compounded drugs billed by Fusion Rx to Federal health care programs.

Other Conduct

During the course of defendant's relationship with Vahedi, defendant learned about Fusion Rx's copayment practices. As part of Fusion Rx's contracts to do business with various insurance networks, through Pharmacy Benefit Managers (PBMs), Fusion Rx agreed to collect copayments from patients for the prescriptions Fusion Rx fulfilled. Because the copayments created a disincentive for patients to request expensive and potentially unnecessary compounded drug prescriptions, initially Fusion Rx did not collect copayments from all its customers as required. To the extent patients were occasionally charged copayments, Fusion Rx would provide gift cards to patients to offset the amount of the copayments.

Later, after concerns surfaced that PBMs and insurance providers might audit Fusion Rx to determine whether Fusion Rx was actually collecting copayments, Vahedi, with defendant's knowledge, directed Fusion Rx would make it appear falsely that copayments had been collected. To this end, funds from Fusion Rx were used to purchase American Express ("AMEX") gift cards, which Fusion Rx staff used to pay the copayments on patients' behalf and without patients' knowledge. Fusion Rx submitted claims on these prescriptions to various insurance providers, falsely representing that these patients had paid the required copayments. These false representations were material to health care benefit programs, who paid the underlying claims relying on the misrepresented copayments.

Vahedi enlisted defendant and Pearson to help him maintain the illusion that patients were paying these copayments, which defendant knew were actually paid with the AMEX gift cards purchased by Fusion Rx. For example, on April 22, 2015, Vahedi emailed defendant and Pearson with the subject line "Audit was today" and instructed as follows: "Please make sure that all your patients know to say that they did pay the copay and that they paid with credit card. If asked for a card number the response should be I don't remember which card I used or I don't have my wallet or purse with me." Similarly, Vahedi used defendant as a

4

>conduit to make sure that Pearson's patients falsely confirmed that they paid a copayment for their prescriptions. For example, on March 5, 2015, Vahedi sent a text message to defendant, writing: "You have to make sure that all of [Pearson's] people say they paid a copay if asked."
>
>Insurance providers reimbursed Fusion Rx approximately $4,405,925 based on claims for which Fusion Rx falsely represented that the required co-payments had been paid.

(Plea Agreement ¶ 14, at 11-16).

**III. SENTENCING GUIDELINES**

The government agrees with the PSR's calculation of defendant's guideline range, which is consistent with the plea agreement. Because defendant pleaded guilty to a conspiracy to violate the Anti-Kickback Statute, his base offense level is 8 under USSG § 2B4.1(a). To that another 14 levels is added because the amount of kickbacks paid in connection with federal health care programs -- $1.25 million -- is more than $550,000. Id. §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(I). Defendant's timely resolution of his case also merits a three-level downward adjustment for acceptance of responsibility, which results in a total offense level of 19, corresponding to a guideline range of 30 to 37 months' imprisonment.

Contrary to what defendant argues in his objections to the PSR, he should not receive a two-level reduction for his minor role in the offense. While he is certainly less culpable overall than his codefendant Navid Vahedi, that fact is already accounted for in the plea disposition he received and applicable sentencing guidelines, which acknowledge defendant's chief involvement in facilitating illicit kickbacks as compared to Vahedi's principal responsibility for the related health care fraud. Defendant's guideline range is therefore substantially lower than it would have been had he been

5

convicted of all criminal conduct for which he was charged, including health care fraud, money laundering, and aggravated identity theft. A minor role adjustment on top of that benefit is therefore not appropriate. Cf. USSG § 3B1.2, comment. (n.3(B)) ("If a defendant has received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role under this section ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense.").

Even ignoring the separate benefits defendant is receiving as part of his plea agreement, his involvement in the illegal kickback conspiracy does not qualify him as "substantially less culpable than the average participant in the criminal activity." Id. § 3B1.2, comment. (n.3(A)). As part of his plea agreement, he acknowledged deriving $328,835.90 from the kickback offenses (Plea Agreement ¶ 3(a)), which is a substantial percentage of $1.25 million -- the estimated figure of the kickbacks paid in connection with claims to federal health care programs. His conduct was also sophisticated and extensive, involving the use of his own business Sheridan Medical over the course of years to funnel kickback payments from Vahedi's company to Joshua Pearson's. Based on this conduct, defendant does not qualify as merely a minor participant even if Vahedi was a more serious offender.[2]

---

[2] Defendant also attempts to color himself as less culpable than Joshua Pearson. As the government argued in its sentencing position in that case, but for Pearson's substantial assistance, he would have warranted a guideline sentence of 30 months' imprisonment. Pearson also lacked the same direct involvement with Vahedi's health care fraud scheme relating to copayments. (E.g., PSR ¶ 36).

6

That said, the government does move for a two-level downward departure pursuant to USSG § 5K1.1 based on defendant's assistance. To be clear, defendant did not provide any additional information or evidence unknown to the government that assisted in the investigation or prosecution of crimes in this matter. But, as part of his plea agreement, he agreed to cooperate by testifying at court proceedings, including any trial involving codefendant Vahedi and his pharmacy Fusion Rx, and defendant's plea agreement was disclosed to Vahedi. The government presumes, based on that fact, that defendant's agreement to cooperate played some role in convincing Vahedi and Fusion Rx to enter guilty pleas in this case, and a two-level downward departure accounts for that assistance.

After accounting for the departure, defendant's offense level is 17, which carries a guideline range of 24 to 30 months' imprisonment. The government recommends a 24-month sentence, which falls at the low end of that range.

**IV. ARGUMENT**

    **A. A Two-Year Sentence Is Sufficient, But Not Greater Than Necessary, to Accomplish the Goals of Sentencing**

Defendant's crime was serious and sustained. From 2014 to 2016, he used his marketing business as a vehicle to funnel illegal kickbacks from Fusion Rx to Joshua Pearson's business, where the funds were further dispensed to various physicians and patients to steer prescriptions for compounded medications back to Fusion Rx. For his part in the scheme, defendant was aware not only of the illegal referrals, but also of the fact that Fusion Rx was waiving or paying copayments on behalf of patients -- a clear indication most the patients lacked a bona fide medical need for the compounded

7

drugs, since otherwise paying a copayment would not discourage them from seeking their prescriptions. Defendant therefore performed a key role in furthering an illegal kickback scheme that was not only costly on its own terms, but also facilitated defrauding health care providers.

The profitability of the conspiracy -- and others like it -- also demonstrates the need for general deterrence. The amount of money passing through defendant's business was significant: over $7.9 million, with more than $5.4 million being paid further to Pearson's business PHIRX. And the complexity of medical billing, the flow of funds, and the involvement of third-party payers all make exposing schemes like this one all the more difficult, meaning the likely punishment must be sufficient on its face to deter future offenders. As the government noted in its sentencing position for Joshua Pearson, the Government Accountability Office estimated that improper payments from Medicaid in fiscal year 2016 totaled 10.5 percent ($36 billion) of the entire program budget -- an increase from the prior year's 9.8 percent. See Carolyn L. Yocom, Testimony Before the Subcomm. on Oversight and Investigations, Comm. on Energy and Commerce, House of Representatives (Jan. 31, 2017), available at https://www.gao.gov/assets/gao-17-386t.pdf. These losses, which are already enormous, do not even capture improper billing for Medicare or programs like TRICARE affected in this case.

Defendant's personal background cuts in two directions. On the one hand, his general lack of criminal history and stable circumstances suggest he is not especially likely to reoffend after serving his sentence. On the other hand, his personal circumstances demonstrate all the more strongly that his crime was a reasoned

8

decision for which he should be held responsible, since it was neither a momentary lapse in judgment nor one that was the result of a lack of viable alternatives. In this case, the government's recommended sentence of two years' imprisonment appropriately accounts for the various sentencing factors at play. It acknowledges the seriousness of defendant's crime and provides a sanction that will make others like him think twice before following a similar path. At the same time, it factors in defendant's personal circumstances and takes into account the effect defendant's agreement to cooperate likely had on resolving the case as a whole.

**B. Restitution and Forfeiture**

The government agrees with Probation's breakdown of the restitution amounts in this case:

| | |
|---|---|
| CVS Caremark | $912,875 |
| TRICARE | $329,250 |
| OPM | $6,750 |
| Amtrak | $1,125 |

The government also agrees with Probation's recommendation that defendant be made jointly and severally liable for restitution in this case with the other participants in the scheme, though the government anticipates the total restitution order will be larger in the case of codefendant Vahedi given his guilty plea to conspiracy to commit health care fraud.

On February 12, 2021, consistent with the plea agreement, the Court entered a money judgment of forfeiture against defendant for $328,835.90. Defendant has already satisfied that judgment, which is a factor in defendant's favor the Court may consider in crafting an appropriate sentence.

9

### C. Probation's Recommended Fine and Conditions of Supervised Release Are Appropriate

Defendant's arguments against imposition of a fine are wholly unconvincing. First, the fact that defendant may have to pay capital gains taxes on his $669,637.23 in a securities account or incur a penalty from making an early withdrawal from retirement accounts holding hundreds of thousands of dollars is not a basis for avoiding the payment of a fine. Second, defendant also misunderstands the purpose of a criminal fine. It should not be conflated with forfeiture or other means by which criminally derived funds must be disgorged. Rather, a fine is a criminal penalty, and the law does not support defendant's extraordinary claim that he may not be required to pay above and beyond the profits he derived from his crime. Indeed, the very notion of a criminal punishment is that it does more than restore the status quo ex ante -- it punishes a defendant for his actions. In this case, the recommended fine of $10,000 falls at the low end of defendant's guideline range and is eminently reasonable in light of defendant's considerable assets. See USSG § 5E1.2(c)(3).

Defendant also objects to two conditions of supervised release recommended by Probation. First, he objects to a drug-testing condition because he failed to disclose past drug and alcohol use upon the advice of counsel. (Def.'s Sent. Memo. 21-22). Given that he has a prior DUI conviction, albeit an old one, and given his unwillingness to provide further information to Probation on the subject, it is not unreasonable to require defendant to submit to drug testing. The supervised release statute generally requires imposition of a drug-testing condition. See 18 U.S.C. § 3583(d).

10

That condition may be waived if "a low risk of future substance abuse is indicated," but absence of evidence is not evidence of absence in this context -- rather, without any evidence establishing that a defendant does not abuse drugs, a district court is well within its discretion to impose the standard testing condition. United States v. Jackson, 189 F.3d 820, 825 (9th Cir. 1999). To hold otherwise would essentially allow defendants in many cases to avoid this statutory condition merely by failing to be forthright with Probation during the presentence investigation interview.

Nor is it overburdensome to require defendant to seek approval from Probation before undertaking any self-employment. As part of his criminal conduct in this case, defendant used his business, Sheridan Medical, to funnel kickbacks to Joshua Pearson's business. In particular, the PSR identifies reasons to believe oversight is needed here:

> During his term of PSA supervision, Kieffer has reported his sole employment as owner of J. Sheridan Enterprises. During his presentence interview, he reported that he also worked for codefendant Vahedi at Axia Pharmaceuticals from February 1, 2017, to March 25, 2021. During the verification process, Kieffer's wife reported that Kieffer also owns and operates Shield Medical which he started in 2020.

(PSR ¶ 19). The issue here is not whether defendant intentionally misled Pretrial Services at the time of his initial appearance, which defendant disputes; rather, the issue is whether the number of business ventures, the involvement of Vahedi, and defendant's use of one of his own companies to facilitate the offense together require greater oversight by Probation than ordinary salaried employment. The condition does not forbid defendant from engaging in self-employment; it merely requires that Probation approve that self-

11

employment, which will foster greater transparency and deter defendant while on supervised release from playing fast and loose with any of his businesses -- which is all the more important in a case like this, where defendant's ongoing restitution obligation requires providing Probation insight into his financial condition.

## V.  CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence of 24 months' imprisonment to be followed by a three-year period of supervised release, a fine of $10,000, a $100 special assessment, and restitution as set forth above.